## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

ZACHARY SWAIN,                                )
                                             )
                                             )
                    Plaintiff,               )
                                             )
v.                                           )
                                             )          CIVIL ACTION NO. CV-2022-
MAINE DEPARTMENT OF CORRECTIONS,             )
RANDALL LIBERTY, RYAN THORNELL,              )          00408
MATTHEW MAGNUSSON, HEATHER                   )
RICHARDSON, KYLE RUFFNER,                    )
WELLPATH, LLC., DANIEL RITTER,               )
AMANDA SEIRUP, JASCHA PROPP, AND             )
ROBYN HODGES,                                )

                    Defendants.

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, by and through undersigned counsel, Alexis Chardon of

Garmey Law, and complains against the Defendants as follows:

### INTRODUCTION

1.      Zachary Swain ("Zach") is a former prisoner at Maine State Prison who suffers

from chronic mental illness.  For several years, he experienced a mental health crisis in prison.

Instead of treating his acute mental illness, Defendants willfully ignored his condition and treated

the manifestations of his mental illness like behavioral problems instead.

2.      As a result, Defendants punished – and exposed Zach to an endless cycle of

punishment – for his mental illness.  Mostly, this punishment took the form of long-term solitary

confinement, a response that that Defendants knew was likely to exacerbate, not treat, his illness.

3.      Aware of the inhumane and dangerous effects of solitary confinement and the

constitutional protections against its long-term use in cases like Zach's, Defendants sometimes

1

attempted to minimize his treatment by using terminology other than "solitary confinement." Regardless of the institutional nomenclature, however, Zach's reality was the same: 22 hours or more spent alone in a cell each day, deprived of mental health therapy other than infrequent sessions spent yelling through a locked cell door or chained to a table in four-point restraints, unable to engage in out-of-cell activities like exercise or programming except for one hour spent in a cage outside, unable to participate in programming and services out of cell without four-point restraints, and unable to satisfy the basic need for human contact in any meaningful way.

4.       Defendants' attempt to cloak the wolf of solitary confinement in sheep's clothing is a well-known, but unacceptable, tactic for avoiding the constitutional consequences of such torture.  As the National Commission On Correctional Healthcare (NCCHC) clarifies: "Different jurisdictions refer to solitary confinement by a variety of terms….Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement."

5.       Among other things, Zach's treatment was an extreme and substantial deprivation of meaningful contact with others, and it will therefore be referred to in this Complaint as what it was – "solitary confinement" – regardless of the various other terms used by Defendants.

6.        In total, Zach spent over three years in long-term solitary confinement, including one period that lasted 636 days: one year and nine months.

7.       The results were predictable. The solitary confinement made Zach decompensate further, spiraling him into a cycle of acting out as a result of his mental illness and then receiving a punishment – more disciplinary isolation – that only made his mental illness worse.

8.       The main target of Zach's manifestations of his mental illness was Zach himself. During his last years in prison, Zach tried to harm himself with alarming frequency: he attempted

to open his veins with razor blades and broken shower heads, he punched walls so hard that it broke his hand, he hung himself twice, and he repeatedly swallowed non-food items that could kill or hurt him including pieces of pens, plastic condiment packages, radio pieces, copper wire, toenail clippers, plastic forks, and razor blades.  In June 2021, Zach's intestine was punctured by a copper wire he had swallowed, requiring him to be transported to an outside hospital, where doctors performed a surgery to remove the wire and damaged colon, placing an ileostomy bag.

9. Defendants could have provided Zach with the acute inpatient mental health treatment that he needed by simply transferring him to the Inpatient Mental Health Unit at Maine State Prison ("IMHU"), or an outside mental health facility.  The IMHU was designed in response to growing understanding and concern that disciplinary tools like solitary confinement were being used to punish mentally ill prisoners who actually needed – prisoners just like Zach. Despite having the capacity, resources, and power to transfer Zach for treatment, Defendants denied him transfer, again and again.

10. Defendants knew that their conduct would only going to make Zach more dangerous –most of all, toward himself.  The longer Zach remained without adequate mental health care treatment, the more difficult it became for him to break the cycle of harm to himself and others, perpetually increasing the risk of more solitary confinement and even more jail time.

11. Defendants consciously disregarded Zach's mental illness by categorizing his behavioral problems as solely criminal "bad behavior", and ignoring or minimizing his significant mental health history and problems.  In so doing, these Defendants knowingly used false justifications for their refusal to transfer him to IMHU and their refusal to provide Zach the care that he needed. These same Defendants knew that the Correctional Officers responsible for Zach's treatment were not trained to understand or treat Zach's mental illness, and that they

3

would and did interpret it as criminal behavior. As a result, these Defendants put Zach at risk of further harm and abuse, and Zach repeatedly suffered.

12.     Notwithstanding Zach's lengthy record of self-harm and attempted suicides, Defendants continued to put him at risk and falsely assert that Zach did not qualify for IMHU transfer because he did not have a qualifying mental illness or disability.

## NATURE OF THE ACTION

13.     In this lawsuit, Zach seeks vindication of his rights under the Americans with Disabilities Act, the Eighth Amendment, the Fourth Amendment, and the Maine State Constitution.  He brings these claims pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681.

14.     ***Counts One and Two*** seek compensatory and punitive damages under the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Maine State Constitution.  By placing Zach in extended solitary confinement notwithstanding its obvious, devastating impact on his mental health, the Defendants inflicted cruel and unusual punishment on Zach, exhibited deliberate indifference to his serious medical needs, inflicted punishment on him for no legitimate penological purpose, and deliberately failed to protect him from the known risk that he would harm himself.  This caused extreme mental anguish, suffering, and multiple physical injuries, in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

15.     ***Count Three seeks*** compensatory damages under the Americans with Disabilities Act.  Defendant MDOC discriminated against Zach because of his mental illness, in violation of the Americans with Disabilities Act ("ADA").  Zach's mental illness is a disability covered by the ADA.  While MDOC has policies to ensure that that MDOC prisoners with conventional

4

medical needs (such as physical injuries or illnesses) receive the medical treatment they need, they discriminated against Zach because he was mentally ill and therefore did not provide equivalent treatment for Zach's mental health condition. Although MDOC actually had an Intensive Mental Health Care Unit (IMHU), which was created in response to calls for more humane treatment of mentally ill people and was available to serve the special needs of prisoners like Zach, Defendants refused to allow him to go there for treatment. Instead, they followed a continuing discriminatory policy of forcing him to undergo extended torture in solitary confinement, without appropriate treatment, until his sentence was completed.  Time and time again, they did not treat his mental illness, but instead retaliated against him for having it.

16.    In further violation of the ADA, the Defendants failed to provide reasonable accommodations for Zach's disability.  MDOC provides prisoners with a variety of programs and services, and they are obligated not to segregate disabled persons from non-disabled ones. Furnishing the basic human need of sensory stimuli and interaction with other persons is among the basic programs and services it provides.  It is widely recognized in medical literature that human beings suffer severe psychological and even neurological damage without such interaction.

17.    In Zach's case, reasonable accommodations for his disability would have included recognition of his diagnoses as real, significant, and severe enough to need treatment, not punishment, and would have allowed him to continue to access much-needed programming, services, and human interaction despite the spiraling manifestations of his illness.  Reasonable accommodation would also have included transfer to IMHU or a state psychiatric facility to provide the mental health treatment he needed.   With such accommodations, Defendants could

have broken Zach's cycle of self-harm and more punishment with real access to these benefits, programs, and services.  Instead, by placing him in extended solitary confinement, they dramatically exacerbated his mental illness, making it more difficult for him to follow prison rules and more likely that he would incur more, longer disciplinary segregation.

18.     ***Counts four and five*** seek compensatory and punitive damages in vindication of Zach's rights under the Fourth Amendment to the United States Constitution; Article I, Section 5 of the Maine State Constitution; the Eighth Amendment to the United States Constitution; and Article I, Section 9 of the Maine State Constitution. They pertain to an unlawful prison search and punishment which were made for the sole purpose of retaliating against Zach for peacefully protesting his conditions of confinement.  Defendants forced Zach to walk naked through the prison, remain naked in front of multiple female staff members, and then deprived him of clothing for one week for no legitimate penological or security purpose. These claims are brought against Defendants Richardson, and Kyle Ruffner (Fourth Amendment) and Richardson, Ruffner, and Magnusson (Eighth Amendment).

19.     ***Count Six*** seeks compensatory and punitive damages in vindication of Zach's rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 6-A of the Maine State Constitution. It pertains to the Defendant's deprivation of Zach's procedural due process rights to review and challenge his confinement.

### **JURISDICTION AND VENUE**

20.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the

Rehabilitation Act.  This Court has supplemental jurisdiction over the claims brought under the Maine State Constitution pursuant to 28 U.S.C. § 1367, because these claims are so related to the federal claims that they form part of the same case or controversy.

21.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), one or more of the Defendants resides in the District of Maine and the events giving rise to the claims asserted in this lawsuit arose in this judicial district.

## PARTIES

22.   Plaintiff Zachary Swain was incarcerated at the Maine State Prison ("MSP") in Warren, Maine from December 2015 to February 2022.  He is now a resident of South Portland, Maine.

23.   Defendant Maine Department of Corrections ("MDOC") operates the MSP.  It subjected Zach to solitary confinement pursuant to a continuous practice under which certain difficult mentally ill prisoners are placed in prolonged solitary confinement instead of being provided with appropriate mental health treatment.  The State of Maine, and MDOC, receive federal funding.

24.   Defendant Randall Liberty is the commissioner of MDOC.  Defendant Liberty has actual knowledge that solitary confinement both causes and exacerbates mental illness.  During Zach's incarceration, he had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide.  At all relevant times Defendant Liberty had the power to ensure this treatment was provided by MDOC, and that Zach would be removed from or not placed into solitary confinement and could receive access to programs and services, but he did not do so.

7

25.    Defendant Ryan Thornell is the Deputy Commissioner of MDOC.  Defendant Thornell has actual knowledge that solitary confinement both causes and exacerbates mental illness.  During Zach's incarceration, he had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide.  At all relevant times Defendant Thornell had the power to ensure this treatment was provided by MDOC, and that Zach would be removed from or not placed into solitary confinement and could receive access to programs and services, but he did not do so.

26.    Defendant Matthew Magnusson is the Warden of the Maine State Prison.  Defendant Magnusson has actual knowledge that solitary confinement both causes and exacerbates mental illness.  During Zach's incarceration, he had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide.  At all relevant times Defendant Magnusson had the power to ensure this treatment was provided by MDOC, and that Zach would be removed from or not placed into solitary confinement, but did not do so.

27.    Defendant Heather Richardson was at relevant times the unit manager for the Administrative Control Unit at the Maine State Prison where Zach was held in prolonged isolation.  Defendant Richardson has actual knowledge that solitary confinement both causes and exacerbates mental illness.  During Zach's incarceration, she had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide.  She knew that the disciplinary restrictions imposed in lieu of treatment were likely to exacerbate, not treat, Zach's mental illness.  At all relevant times Defendant Richardson had the power to ensure this

8

treatment was provided by MDOC, and that Zach would be removed from or not placed into solitary confinement and discriminatory disciplinary restrictions, but she did not do so. She also planned and executed the unconstitutional strip search and retaliatory punishment identified in Counts Four and Five of this Complaint.

28. Defendant Kyle Ruffner was at relevant times the sergeant in charge of supervising the A2 housing unit on which Zach was confined in isolation conditions. At relevant times, he was also the sergeant in charge of the prison's Special Operations Group, and in that capacity planned and executed the unconstitutional strip search and retaliatory punishment identified in Counts Four and Five of this Complaint.

29. Defendant Wellpath LLC (Wellpath) is a private company that is under contract to provide medical care, including mental health care, to prisoners of MDOC. Wellpath is obligated to provide comprehensive and specialized mental health services, including any necessary specialty and emergency care. Despite its contractual obligations, however, Wellpath refused to provide Zach with the intensive mental health care that he needed. Wellpath employs Defendants Ritter, Seirup, Propp, and Hodges.

30. Defendant Daniel Ritter is the Maine State Prison Health Services Administrator for Wellpath. Defendant Ritter has actual knowledge that solitary confinement both causes and exacerbates mental illness. During Zach's incarceration, he had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide. He knew that the disciplinary restrictions imposed in lieu of treatment were likely to exacerbate, not treat, Zach's mental illness. At all relevant times Defendant Ritter had the power to ensure this treatment was provided by MDOC and Wellpath, but he did not do so.

31.     Defendant Dr. Amanda Seirup is the Director of Behavioral Health at the Maine State Prison for Wellpath. Defendant Seirup has actual knowledge that solitary confinement both causes and exacerbates mental illness.  During Zach's incarceration, she had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide.  She knew that the disciplinary restrictions imposed in lieu of treatment were likely to exacerbate, not treat, Zach's mental illness. At all relevant times Defendant Seirup had the power to ensure this treatment was provided by MDOC and Wellpath, but she did not.

32.     Defendant Dr. Jascha Propp is the Behavioral Health Director at Maine State Prison for Wellpath.  Defendant Propp has actual knowledge that solitary confinement both causes and exacerbates mental illness. During Zach's incarceration, he had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide. He knew that the disciplinary restrictions imposed in lieu of treatment were likely to exacerbate, not treat, Zach's mental illness.  At all relevant times Defendant Propp had the power to ensure this treatment was provided by MDOC and Wellpath, but he did not do so.

33.     Defendant Dr. Robyn Hodges is the Regional Behavioral Health Director at Maine State Prison for Wellpath.  Defendant Hodges has actual knowledge that solitary confinement both causes and exacerbates mental illness.  During Zach's incarceration, she had specific knowledge that Zach was being held in prolonged solitary confinement and was in need of inpatient psychiatric care and appropriate treatment which MDOC and Wellpath were failing to provide.  She knew that the disciplinary restrictions imposed in lieu of treatment were likely to exacerbate, not treat, Zach's mental illness. At all relevant times Defendant Hodges had the

10

power to ensure this treatment was provided by MDOC and that he was removed from solitary confinement, but she did not do so.

## FACTUAL ALLEGATIONS

### *Zach's Chronic and Severe Mental Illness*

34.    Zach Swain is a twenty-six-year-old man who has been struggling with mental illness for nearly his entire life.  From early on, this mental disability has made it difficult for Zach to function normally at home and at school.

35.    When Zach was in second grade at Pond Cove Elementary School in Cape Elizabeth, Maine, he had a mental breakdown in school.  He was soon diagnosed with bipolar disorder and ADHD.  Often unable to control his behavior or be controlled, the school district identified that he was disabled and therefore needed accommodations, including modified school day and specialized behavior plan, and provided him a one-on-one aide at all times while in school.

36.    By the time Zach was in third grade, he was receiving intensive wrap-around programming through the Anchor Program at Maine Medical Center.  Psychological testing revealed that he struggled with clinically significant behavioral regulation, metacognitive deficits, and global executive functioning difficulties.

37.    Zach was only ten years old and in the fourth grade when he was first hospitalized in a psychiatric ward.  He was checked into Spring Harbor after showing an increased amount of aggression and self-injurious behaviors, including biting himself and jumping out of a moving car. There, he was diagnosed with Mood Disorder, Anxiety Disorder, Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, and PTSD related to the use of restraints at school and his parents' divorce.

38.     By the age of twelve, when he was in 6th grade, Zach carried the diagnoses of Bipolar and ADHD.

39.     By the time he was fourteen years old, Zach had also been diagnosed with anxiety and depression.

40.     At fifteen, Zach was again hospitalized in a psychiatric ward.

41.     At sixteen, Zach was hospitalized again, this time after having tried to kill himself by swallowing pills.

42.     A psychological evaluation performed in 2012, when Zach was sixteen, noted: "Zach has a lifelong history of significant behavioral, emotional, sensorimotor, academic, attentional, executive function, and social problems that manifest in a pervasively low level of consistent adjustment and functioning. …. Although Zach does not appear to meet the full criteria for either Asperger's Disorder or Pervasive Developmental Disorder, Zach's behaviors and functioning are clearly consistent with a disorder within these spectra (not otherwise specified), owing to his pervasive problems with interpersonal and social interactions, his tendency to view the world as rule-bound, his difficulty with change and being flexible in his routines, and his unusual, often intense, reactions to stimuli. The possibility of a developing schizoid personality style should also be considered."

43.     The 2012 psychological evaluation also noted that Zach's "affective chaos likewise makes him susceptible to losing ideational and behavioral control, with consequent potential for thinking and/or acting impulsively. ....His insensitivity to subtlety and simplistic problem solving results, in part, from his failure to recognize the kinds of behaviors that are expected or required in various situations, which, in turn, puts him at risk for behaving in ways that either offend others or get him into trouble. ..... He is [] likely to have difficulty managing

12

even basic psychological aspects of everyday living without assistance or supervision, and he may be vulnerable to psychotic episodes....Extremely limited in effective coping resources, this young man manifests difficulties with establishing an effective degree of functioning. ...."

44. Before becoming imprisoned at age 19, Zach had a caseworker provided by Maine Care through the Kate Beckett Program. To become eligible for this program, the State of Maine had to make a determination that Zach was "disabled" by Social Security Disability standards and that he would "require a level of care typically provided in a psychiatric hospital, nursing facility, or group home." The State determined that Zach met these criteria.

45. At all relevant times, Defendants had actual knowledge Zach's mental health history as recounted in the previous paragraphs, and they had access to the related medical records, which became part of his healthcare and administrative records at MSP.

### *Solitary Confinement and the Mentally Ill*

46. It is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm to the patient. As the Third Circuit very recently re-affirmed, the risks of long-term solitary confinement on mentally ill prisoners were "obvious" years before Zach suffered the harms described in this Complaint, as "the harm inherent in conditions of solitary confinement has long been recognized. Indeed, the Supreme Court recognized the threat to prisoners' mental health over a century ago[.]" *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022) (*citing In re Medley*, 134 U.S. 160, 168 (1890)).

47. As another federal court has observed, "placing [mentally ill prisoners in solitary confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe," *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995), because such prisoners "are at a

particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions" in solitary confinement. *Id.*

48.     Likewise, the Seventh Circuit has remarked that conditions of solitary confinement "aggravate[] the symptoms of [a prisoner's] mental illness and by doing so inflict[] severe physical and especially mental suffering," *Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006), and that there is a "scientific consensus . . . that prisoners held in solitary confinement experience serious, often debilitating—even irreparable—mental and physical harm[] . . . ." *Wallace v. Baldwin*, 895 F.3d 481, 484-85 (7th Cir. 2018) (citation omitted).

49.     It is also well-known that the impact of solitary confinement is cumulative, in that it causes more damage to a person's mind over time—and that these cumulative impacts can themselves *cause* mental illness.

50.     For these reasons, leading correctional standard-setting bodies specifically provide that solitary confinement should not be used on mentally ill prisoners. For example, the National Commission on Correctional Health Care (NCCHC) Standards for Mental Health Services in Correctional Facilities states that "it is well established that person with mental illness are particularly vulnerable to the harms of solitary confinement," and that "[i]nmates who are seriously mentally ill should not be confined under conditions of extreme isolation."

51.     The NCCHC's official Position Statement on solitary confinement – which was adopted in 2016, before Zach's long-term solitary confinement began – provides that "Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and is harmful to an individual's health….Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of adults or juveniles in

14

custody." The Position Statement further that prison health care staff "must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided." Wellpath is aware of the NCCHC's position on solitary confinement.

52. The American Correctional Association has concluded that seriously mentally ill prisoners such as Zach should not be placed in solitary confinement for more than 30 days.

53. In 2012, the American Psychiatric Association adopted a policy opposing the "prolonged" segregation of prisoners with serious mental illness, which it defined as longer than 3 to 4 weeks.

54. The Association of State Correctional Administrators "believe[s] that lengthy stays [in solitary confinement] manufacture or increase mental illness."

55. American Bar Association Treatment of Prisoner Standards advises that "[p]risoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation."

56. Defendants are well aware of the foregoing consensus that solitary confinement – which is often referred to as "restrictive housing" in the Maine State Prison –  is especially dangerous when used on mentally ill prisoners, and that it is an ineffective response to mental illness.

57. A 2013 report of the Maine ACLU (which was provided to and reviewed by Defendants) states that, "Not only does long-term isolation have disastrous effects on prisoners' mental health, but these effects are frequently irreversible. It is this dimension that makes solitary confinement such a terrible choice for corrections institutions, because it means that prisoners

will return to society less able to control themselves and relate to their surroundings. This, combined with the well-known but seldom-acknowledged fact that almost all prisoners are eventually released from prison, means that prison practices are making life worse for people both inside and outside the prison walls."

58.    As early as 2011 and 2012, MDOC began to make some changes which acknowledged the well-recognized, deleterious effects of solitary confinement.  With these changes, MDOC professed the goals of sending fewer people to solitary, for them to spend less time there, and to provide better mental health resources for prisoners in solitary.  MDOC stated that the changes would provide prisoners in solitary confinement with a clear path and achievable goals for leaving solitary confinement.  The changes acknowledged Defendants' understanding that solitary confinement is inhumane and does not serve to rehabilitate prisoners, but often merely amplifies and even manufactures disturbing and harmful behavior.

59.    Defendants' policies demonstrate their awareness of the constitutional rights that were violated by Zach's long-term solitary confinement.  For example, the MDOC's policies regarding "disciplinary segregation" (which is one of the terms it uses for solitary confinement) state that, "If there is any … mental health condition that might contraindicate the placement [in solitary confinement]" the Unit Manager (*i.e.,* Defendant Richardson), facility Health Services Administrator (*i.e.,* Defendant Ritter), Chief Administrative Officer, and Commissioner (*i.e.,* Defendant Liberty) all have responsibilities to ensure that the decision is appropriate in light of the mental health condition." The policy also requires other protections, such as making sure the "same medical and behavioral health services" are available to a prisoner on solitary confinement as would be made available to general population, and that any prisoner on segregation status for more than thirty days must have an individualized treatment plan that

16

includes "treatment as necessary, and steps to facilitate the transition of the prisoner to the general population."

60.    Further, the MDOC's policy regarding the Intensive Mental Health Unit states that, "The Department of Corrections recognizes the need to provide structured intensive mental health services in a specialized mental health housing unit to accommodate the needs of male prisoners experiencing serious mental health problems."  It provides that the IMHU is "*the* housing unit of the Department of Corrections for male prisoners with serious mental illnesses, persistent disabling personality disorders, or severe cognitive impairments who require structured intensive mental health services" and that the IMHU "may provide services to any male prisoner in need of help during a psychiatric, psychological, or emotional crisis, which may include a prisoner … presenting a danger to himself or others, or unable to care for himself, or a prisoner who has a severe and persistent mental illness or personality disorder or cognitive impairment."

61.    The MDOC's IMHU Policy also states that, "The purpose of the IMHU is to help prisoners function at their optimal levels, under the least restrictive conditions necessary, while working towards the reduction of criminogenic risk factors."

62.    Defendants are aware that solitary confinement does not actually serve as a deterrent to dangerous behavior, and it is not an appropriate treatment or response to mental illness. In a newspaper article published in the Bangor Daily News about Zach's plight, Warden Magnusson admitted as much, stating:  "I don't think you'll find many people saying restrictive housing works or fixes people. We learned many, many years ago."

63.    Defendants' disregard of their own policies and admissions when it came to Zach's long-term solitary confinement shows that Defendants knew that their treatment was

violating his clearly established rights, was putting him in danger, and was not accommodating his mental illness.

### *Zach's Incarceration and Deterioration in Solitary Confinement*

64.   Zach was imprisoned in late 2015 after pleading guilty to a crime involving a violent assault during a marijuana transaction.

65.   Since the start of his incarceration, Defendants have been aware of Zach's chronic and severe mental illnesses. A December 23, 2015 initial mental health evaluation performed at Maine State Prison noted his inpatient hospitalization history beginning at age ten and recorded diagnoses of mood disorder, depression, anxiety, adjustment disorder with mixed disturbance of emotions and conduct, among other disorders.

66.   Zach's mental health began a downward spiral around April 2018. That month, he was alleged to have assaulted an officer, causing minor injuries, after being told he could not have commissary.  He was put into ACU placement and charged criminally with assault on an officer.

67.   "ACU placement" is solitary confinement, amounting to prolonged isolation without the ability to have meaningful human contact.

68.   Zach would spend the next 491 days (or one year and four months) in isolation. There, he would have no access to meaningful human conversation or contact.

69.   During this time, Zach was alone in a small cell by himself for as many as 23, and sometimes 24, hours per day. When he was allowed out onto the yard for recreation, he was kept in a cage, isolated from others.  He did not have a cellmate or a prison job. He could not attend educational programming, or socialize in the commissary, rec yard, pod common area, gym, or library.

18

70. For most of the time of his solitary confinement, up until the day he was discharged from prison to go home, Zach could not leave his cell without four-point restraints.

71. In isolation, Zach received little or no mental health therapy, and what counseling he did receive consisted of once-weekly sessions of five to 40 minutes. For the most part, Zach could not leave his cell for these sessions, instead having to yell through the door. When he could leave his cell, he was forced to wear four-point restraints and be chained to a table during the therapy session.

72. In solitary confinement, Zach's mental health began to decompensate dramatically. He lost touch with reality. He became depressed, teary at times, and reported losing hope. Zach reported fears that he could not control his behavior, that he did not feel like himself, and that he felt paranoid. In November 2018 (approximately seven months into solitary confinement), he reported seeing bugs on his floor or feet that would suddenly disappear.

73. Zach often refused to leave his cell even for the short one or two-hour period he allowed, citing fears that he would not be able to behave or hopelessness that nothing would change for him. He refused treatment and even visits and contact from his family when it was allowed. These were further signs of acute mental health crisis.

74. The exacerbation of Zach's mental illness made it even more difficult than usual for him to follow prison rules and keep from acting out against others.

75. As a result, he acquired multiple additional criminal charges for acts which, if true, were manifestations of his deteriorating mental state. On such example occurred in May 2018, when Zach was alleged to have spit upon a prison doctor after having swallowing multiple pieces of metal and he was criminally charged for these acts.

19

76.    But Zach's primary target was himself. He began serially swallowing non-food items that could seriously injure or kill him: metal envelope clasps, toothbrushes, plastic spoons, razor blades, toenail clippers, copper wires, ketchup packages, parts of a USB drive, parts of a radio, parts of pens, razor blades, and plastic forks.

77.    In early spring 2020, Zach finally made it back to general population after nearly two years in solitary confinement. Unsurprisingly, however, given the degree to which he had decompensated over the past twenty-one months, Zach did not last long.  His illness made it harder to follow prison rules, and by the end of May he found himself in himself in solitary confinement once again.  This time, he would remain there for 636 days (one year, eight months, and 26 days).

78.    Zach's reaction to the prospect of plunging into more indeterminate months in solitary confinement was tragically predictable.  He became hopeless and desperate.

79.    Zach racked up charges for officer assaults, often for attacking guards with urine, feces, or saliva.  These assaults and altercations were often motivated by Zach's perception that the officers were attempting to harm or torment him, such as by squirting feces and urine under his cell or putting them in his food.   At one point, Zach faced the potential of years of additional prison time, if he were to be convicted for any of these in-prison assaults.

80.    Again, however, Zach's main target was himself. Soon after plunging back into solitary in May of 2020, Zach tried to hang himself with a bed sheet, twice, and swallowed non-food items to hurt himself.  Zach's solitary confinement was clearly putting him in imminent and grave danger.

**The June 17, 2020 Strip Search, Nude March, and Humiliating Punishment**

20

81.     On June 17, 2020, Zach and two other inmates attempted to peacefully protest their solitary confinement conditions by remaining on the yard after their hour of caged recreation was over.  Anticipating that guards would use pepper spray on them, they took off their tee shirts and wrapped them around their heads and faces.  This time, however, Defendants Richardson and Ruffner, along with other employees of MDOC, decided not to use pepper spray. Instead, they decided to throw a terrifying "flash bomb" at Zach and the others.

82.     After the loud explosion, officers assaulted Zach and forced him and the two other protesters to remove all of their clothing. Then, as a result of the decisions of Defendants Richardson and Ruffner and with their approval and assistance, they were forced, naked and cuffed, on a humiliating march through the prison.

83.     Zach was marched into the prison cafeteria, where multiple staff members, including multiple female staff members, were waiting.  With the approval and assistance of Defendant Richardson, Zach was forced to undergo an invasive strip search in front of these people and to remain naked for what felt like an eternity. Zach was humiliated.

84.     After this experience, Zach was sent back to an isolation cell, where he was deprived of clothing for approximately almost a week. This was done for no legitimate purpose other than to humiliate Zach and punish him for his peaceful protest on the yard.  This extended period of forced nudity was a direct result of the decisions of Defendants Magnusson, Richardson and Ruffner, and with their approval and assistance.

85.     For six long days, Zach tried to cover himself with the bedsheet to protect his privacy. He even had to wear the bedsheet under his four-point restraints to travel through the prison to Medical and the showers, and while chained to the wall to make his phone call.

21

Again, during this time Defendants Richardson, Ruffner, and Magnusson had the ability to end this period of forced, punitive nudity, but chose not to.

86.    After the June 2020 protest, solitary confinement only continued to make Zach more ill, and yet Defendants continued to treat manifestations of his illness as criminal behavior. Instead of treating Zach's mental illness and alleviating his solitary confinement, this treatment caused Zach to accrue more solitary confinement and even risk more prison time.

### Zach's Insufficient Care

87.    Despite the clear risk and present harm posed to Zach by the combination of his mental illness and solitary confinement, Defendants persisted to use solitary confinement as a tool to "discipline away" his sickness.

88.    Throughout his time at MSP, Zach received either grossly insufficient mental health treatment, or none.  During periods of solitary confinement, Zach's treatment consisted of forty minutes or less of "talk therapy" per week.  Mostly, this talk therapy required him to yell through a locked prison door at a counselor who would be present for sessions as short as five minutes.

89.    Repeatedly, Zach pleaded for the human contact and more intensive mental health treatment he so desperately needed, but did not get it.  In August 2020, for example, Zach told his counselor that he was "not doing well" and "discussed his desire to gain more control over his actions and learn how to regulate his emotions."  He specifically asked to go to the Inpatient Mental Health Unit to receive more mental health treatment. He was refused.

90.    Zach was, at times, provided the opportunity to meet with incarcerated peers as a form of mentorship or peer counseling.  These short sessions  – while not nearly sufficient – were important to Zach and dramatically improved his outlook.  Defendants, however, used them

as a disciplinary tool, and deprived Zach of the ability to meet with his peers when he "acted out" as a result of his mental illness.  As one illustration, a note from Defendant Seirup documents a call from Zach's mother expressing concern for his well-being in solitary confinement in light of his mental health history.  In response, Defendant Seirup explained to Zach's mother that Zach would be entitled to the "many positive opportunities at MSP…[which] he can become involved in once he can demonstrate safety and positive decisions."

91.    In the face of Zach's obvious mental health crisis, Defendants continually refused to provide him with the care he needed.  For example, in September 2020, Wellpath agents Drs. Propp, Hodges, and others met to consult on Zach's multiple requests for IMHU placement. Despite knowledge of Zach's long history of chronic mental illness and his atrocious acts of self-harm, these Defendants inexplicably concluded he did not need intensive mental health treatment, writing: "Based on his current clinical presentation, [Swain] does not meet IMHU [criteria] at this time and is more appropriate for an ACU placement through security."  On information and belief, Defendant Ritter was also responsible for this decision.

92.    The next month, Zach filed a grievance requesting inpatient mental health treatment. Dr. Propp, among others, denied his request. Instead, he remained in solitary confinement in the ACU.  On information and belief, Defendants Ritter, Seirup, Propp, and Hodges participated in and were responsible for this decision.

93.    In late May 2021, Zach swallowed parts of his clock radio, and then a pair of toenail clippers and copper wire. He waited a week until he told anyone.  By the time he was treated in a hospital, the wire had gotten stuck in Zach's gut and punctured his intestine. He developed a serious infection and underwent surgery to place an ileostomy bag.

23

94.    Zach's ileostomy meant that his bowel movements had to be excreted into an external plastic bag taped to his body. It often inflated with gas and became punctured or torn, spilling its contents everywhere.

95.    During the summer of 2021, Zach was housed in the prison's infirmary while he recovered from the colostomy surgery and infection. Although he did not receive the intensive mental health treatment he needed while in the infirmary, he did get more human contact. As a result, Zach's mental health improved; nor surprisingly, he did not acquire any charges for assault, and he did not commit further acts of self-harm.

96.    In late September of 2021, however, Zach was moved back to restrictive isolation. He was overcome with despair, and his mental health plummeted. When he broke a cup and tried to swallow a piece, prison officials responded by spraying him with pepper spray and putting him in a restraint chair for several hours.

97.    Once again, instead of providing Zach with the intensive mental health treatment he needed to break the cycle of his deterioration and give him a chance to stop harming himself and follow rules, Defendants continued to punish Zach's mental illness by imposing disciplinary restrictions and solitary confinement.

### *The Deprivation of Procedural Due Process*

98.    The long-lasting isolation conditions described this Complaint amounted to an atypical and significant hardship compared to the ordinary incidents of jail life. Because of this, Defendants were required to provide Zach with certain procedural safeguards, including periodic review of his isolation status and the right to appeal it.

99.    Defendants avoided providing Zach the procedural safeguards he was due by using titles for his conditions that did not trigger existing procedural safeguard procedures. In

24

reality,  however – and no matter the title of his classification – Zach was on solitary confinement.

100.  For a significant duration of Zach's solitary confinement – including no less than eight months in a row spent on "disciplinary segregation" status, Zach received no procedural due process protections whatsoever. On information and belief, during these periods there was review of his solitary confinement and no opportunity for him to challenge it.

\*\*\*

101.  Throughout Zach's incarceration, Defendants were well aware that solitary confinement both causes and exacerbates mental illness. They knew that allowing Zach to be placed in solitary confinement for any meaningful length of time was toxic to his mental health and would cause him to suffer both mental anguish and—when he harmed himself as a result of that anguish—intense physical pain.  They also had the ability to prevent him from further harm by removing him from isolation and to secure appropriate treatment for his acute and devastating mental condition.  But despite having this knowledge of the harm of isolation and the ability to provide acute mental health treatment, Defendants continued to isolate Zach and deprive him of the treatment he so desperately needed.

**Count One: Eighth Amendment (Deliberate Indifference/Cruel and Unusual Punishment)**
**Against Defendants Liberty, Thornell, Magnusson, Richardson, Ritter, Seirup, Propp, and Hodges**

102.  Each paragraph of this complaint is incorporated as if fully restated here.

103.  This claim is brought pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681.

104.  Each Defendant acted under color of law at all relevant times.

25

105.    Zach suffers from severe mental illnesses that are serious medical conditions and place him at serious risk of harm and in need of intense medical treatment.

106.    By holding Zach in solitary confinement for months on end, Defendants aggravated his mental illness.

107.    Defendants conspired to keep Zach in solitary confinement. In so doing, they were deliberately indifferent to Zach's serious medical needs.

108.    The Defendants knew, at all times relevant, that Zach's serious medical needs were not being treated at MDOC, and that the isolation of solitary confinement would a exacerbate and was exacerbating his condition and cause him further damage over time.

109.    Despite knowing that Zach's mental health was bad and getting worse, Defendants persisted in their approach and "treatment" for his mental health care.  In so doing, they continued to refuse to transfer Zach to intensive mental health care treatment, whether at MDOC or elsewhere, where he could receive care for his serious mental health condition.  Nor did they ameliorate the conditions of his confinement in prison, or provide him with effective treatment.  Instead, they allowed him to remain isolated in solitary confinement, without meaningful access to mental health care.

110.    Defendants' failure to follow their own policies designed for the purpose of protecting people like Zach, such as policies establishing that he was qualified for IMHU treatment, policies intended to reduce solitary confinement in cases like his, and policies requiring evaluation, treatment plants, and transfer to IMHU or other intensive mental health treatment when appropriate, demonstrates deliberate indifference to his serious medical need.

111.    As a result of the Defendants' failure to secure proper treatment for Zach and their decision that he instead be consigned to isolation conditions, Zach suffered physical and psychological injuries, severe pain, and acute mental anguish.

112.    Defendants' consignment of Zach to solitary confinement and/or restrictive isolation constituted cruel and unusual punishment in violation of the Eighth Amendment.

113.    Defendants' deliberate indifference to Zach's medical needs violated his rights to be free from cruel and unusual punishment under the Eighth Amendment.

114.    As a direct and proximate result of Defendants' actions, Zach suffered the mental and physical injuries described herein.

### Count Two: Eighth Amendment (Failure to Protect)

**Against Defendants Liberty, Thornell, Magnusson, Richardson, Ritter, Seirup, Propp, and Hodges**

115.    Each paragraph of this complaint is incorporated as if fully restated here.

116.    This claim is brought pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681.

117.    Each Defendant acted under color of state law at all relevant times.

118.    Zach suffers from severe mental illnesses and disabling personality disorders that are serious medical conditions and place him at serious risk of harm and in need of intense medical treatment.

119.    By holding Zach in solitary confinement for months on end and refusing to provide him adequate treatment and transfer to IMHU, Defendants aggravated his mental illness and put him in immediate risk of self-harming behavior and suicide.

120.    Defendants were aware that Zach's continued isolation and mental illness created a strong likelihood of self-harm, and that providing him with access to human contact,

programming, and intensive mental health treatment was necessary to diminish that strong likelihood of self-harm.

121.    Defendants' disregard of Zach's vulnerability to self-harm and suicide, and their failure to provide the accommodations and treatment he needed, placed him at a substantial risk of serious harm.

122.    The Defendants knew, at relevant times, that Zach's serious medical needs were not being treated at MDOC, and that the isolation of solitary confinement would exacerbate his condition and cause him further damage over time.

123.    Defendants were aware that Zach qualified for IMHU treatment and that he desperately needed it. They also knew that continued isolation would only make him worse. Despite what they knew, the Defendants continued to place him at greater and greater risk by failing to transfer Zach to intensive mental health care treatment, whether at MDOC or elsewhere, where he could receive care for his serious mental health condition.  Nor did they ameliorate the conditions of his confinement in prison, or provide him with effective treatment. Instead, they allowed him to remain isolated in solitary confinement, without meaningful access to mental health care.

124.    Defendants' failure to follow their own policies designed for the purpose of protecting people like Zach, such as policies establishing that he was qualified for IMHU treatment, policies intended to reduce solitary confinement in cases like his, and policies requiring evaluation, treatment plants, and transfer to IMHU or other intensive mental health treatment when appropriate, demonstrates deliberate indifference to his vulnerability towards self-harm.

125.    Defendants' continued use of solitary confinement and disciplinary restrictions to respond to Zach's mental illness in the face of mounting evidence that this was

126.    Defendants conspired to keep Zach in solitary confinement.

127.    In so doing, the Defendants failed to protect Zach from a substantial risk of harm.

128.    As a result of the Defendants' failure to secure proper treatment for Zach and their decision that he instead be consigned to isolation conditions, Zach suffered physical and psychological injuries, severe pain, and acute mental anguish.

129.    Defendants' consignment of Zach to solitary confinement and/or restrictive isolation constituted cruel and unusual punishment in violation of the Eighth Amendment.

130.    Defendants' deliberate indifference to Zach's medical needs violated his rights to be free from cruel and unusual punishment under the Eighth Amendment.

131.    As a direct and proximate result of Defendants' actions, Zach suffered the mental and physical injuries described herein.

## Count Three: Americans with Disabilities Act, Title II
### Against: MDOC

132.    Each paragraph of this complaint is incorporated as if fully restated here.

133.    This claim is brought pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681.

134.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

135.    Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

29

or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

136. To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

137. The State of Maine and MDOC are public entities as defined in 42 U.S.C. § 12131(1).

138. At all times relevant to this Complaint, in light of his severe mental illness, Zach was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

139. Due to his mental illnesses, Zach has a mental impairment that substantially limited one or more major life activities, including but not limited to thinking, interacting with others, and controlling his behavior. As a result of his mental disabilities, he required accommodations and treatment which included intensive inpatient psychiatric therapy.

140. Zach was wholly dependent upon Defendants for basic daily needs and appropriate accommodations. As a state prisoner, he met the essential eligibility requirement for receipt of services or the participation in programs or activities provided by MDOC and the State of Maine.

141. Under Title II of the ADA and 28 C.F.R. § 35.130(a), Defendants were responsible for ensuring that individuals in custody with known disabilities were provided with reasonable accommodations to prevent discrimination on the basis of disability.

30

142.    Despite Zach's known and obvious disability—his severe mental illness, and his repeated attempts to self-harm —Defendants failed to reasonably accommodate his disability, and failed to provide him with access to human contact, rehabilitation opportunities, group therapy, adequate mental health treatment, and the numerous other programs and services that MDOC offers to prisoners outside of their cells.

143.    Based on their ongoing discriminatory policies, Defendants further failed to accommodate Zach's disabilities in MDOC disciplinary processes, and they discriminated against him by deliberately isolating him on account of his mental illness.

144.    The Defendants have and do make arrangements for other prisoners, who require hospitalization outside of MDOC because of physical injuries or illnesses, to receive such outside hospitalization, or to receive effective care within MDOC.  Their withholding of equivalent treatment for Zach and the retaliatory, punitive approach they took toward him were a direct result of discrimination on the basis of his mental disability.

145.    The foregoing accommodations were and are reasonable and, if provided to Zach, would have enhanced his quality of life, ameliorated his mental illness, and alleviated his suffering.  Instead, and precisely because of his mental illness, Defendants placed Zach in solitary confinement or other restrictive confinement conditions, and removed his access to these necessary accommodations.

146.    Defendants discriminated against Zach on the basis of his mental disability by failing to provide him with access to necessary mental health care, services, programs, recreation, education, exercise, and human interaction.

147.    Due to the failure of Defendants to provide Zach with the reasonable accommodation of inpatient intensive psychiatric treatment, access to services, access to humans, Zach was deprived of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services.

148.    The effects of social isolation and dehumanization of his conditions of solitary confinement were worsened by the Defendants' deprivation of Zach's access to mental health programs and services to counteract the effects of the solitary confinement.

149.    As a result of the Defendants' failure to provide reasonable accommodation for his mental illness, and their continuous discrimination against him, Zach suffered extreme mental pain and anguish and physical harm, as described in this complaint.

## Count Four: Fourth Amendment (Unreasonable Search)
### Against Defendants Richardson and Ruffner

150.    Each paragraph of this complaint is incorporated as if fully restated here.

151.    This claim is brought pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681 and seeks vindication of Zach's rights under the Fourth Amendment to the United States Constitution and Article I, Section 6-A of the Maine State Constitution.

152.    At all relevant times, Defendants acted under color of state law.

153.    The June 17, 2020 strip search was an unreasonable search and violated Zach's rights under the Fourth Amendment.

154.    Zach's treatment on June 17, 2020, specifically forcing him to walk nude through the prison and submit to an invasive strip search in front of many staff members including female staff members, was conducted for no legitimate penological or security purpose other than total humiliation of Zach.

32

**Count Five: Eighth Amendment (Cruel and Unusual Punishment)**
**Against Defendants Richardson, Ruffner, and Magnusson**

155.    Each paragraph of this complaint is incorporated as if fully restated here.

156.    This claim is brought pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681 and seeks vindication of Zach's rights under the First Amendment to the United States Constitution and Article I, Section 9 of the Maine State Constitution.

157.    At all relevant times, Defendants acted under the color of state law.

158.    The June 17, 2020 strip search was not conducted for legitimate penological or security purposes, but simply in retaliation for Zach's peaceful protest.

159.    Zach's treatment on June 17, 2020 and after, including forcing him to walk nude through the prison and submit to an invasive strip search in front of many staff members including female staff members, was not conducted for legitimate or penological purposes, but in order to humiliate Zach in retaliation for his peaceful protest. Such forced nudity and exposure in response to a peaceful protests is incompatible with accepted standards of decency, a blatant derogation of Defendant's duty to provide Zach with clothing while in prison.

160.    The extended period of forced nudity which followed the strip search was not conducted for legitimate purposes, but in order to humiliate Zach in retaliation for his peaceful protest.  Such forced nudity and exposure in response to a peaceful protests is incompatible with accepted standards of decency, a blatant derogation of Defendant's duty to provide Zach with the basic necessity of clothing while in prison.

161.    Defendants, Richardson and Ruffner were responsible for the June 17, 2020 strip search and forced march and for Zach's subsequent treatment, and also had the power and responsibility to stop it.

162.    Defendants Magnusson, Richardson, and Ruffner were responsible for Zach's treatment after the June 17, 2020 strip search, including the forced nude march and exposure and the subsequent week without clothing, and each had the power and responsibility to stop it.

### Count Six: Fourteenth Amendment (Procedural Due Process)

**Against Defendants Maine Department of Corrections, Liberty, Thornell, Magnusson, and Richardson**

163.    Each paragraph of this complaint is incorporated as if fully restated here.

164.    This claim is brought pursuant to 42 U.S.C. §1983 and 5 M.R.S. 337-B §4681 and seeks vindication of Zach's rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 6-A of the Maine State Constitution.

165.    Regardless of the title of his classification, Zach was placed under conditions of solitary confinement for months and years on end.

166.    Zach's extended placement in conditions of solitary confinement was severe, significant, and atypical as compared with ordinary incidents of jail life.

167.    For extended periods of this solitary confinement, Zach's status was not reviewed and he was given no opportunity to challenge it.

168.    This amounted to a deprivation of Zach's procedural due process rights under the Fourteenth Amendment.

169.    As a result of the Defendants' failure to provide due process protections, Zach suffered extreme mental pain and anguish and physical harm, as described in this complaint.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff Zach Swain respectfully requests judgment against Defendants, jointly and severally, for the following:

34

(a)     An award of compensatory, punitive, and nominal damages;

(b)     An award of full costs and attorneys' fees arising out of this litigation

        pursuant to 42 U.S.C. § 1988(b), the ADA, and the RA; and

(c)     Any and other further relief this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action of all issues so triable.

DATED at Portland, Maine this 7th day of April, 2023.

Respectfully submitted,


 */s/ Alexis Garmey Chardon*
Alexis Garmey Chardon, Esq. Bar #5932
*Attorney for Plaintiff, Zachary Swain*
GARMEY LAW
482 Congress Street, Suite 402
Portland, ME 04101
Email: achardon@garmeylaw.com
Phone: 207-835-2060

35