UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ZACHARY SWAIN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:22-cv-00408-JDL |
| | ) | |
| MAINE DEPARTMENT OF CORRECTIONS, et al., | ) ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON DEFENDANTS'
MOTION TO DISMISS**

In count three of his six-count amended complaint, Plaintiff alleges Defendant Maine Department of Corrections ("the MDOC") violated his rights under the Americans with Disabilities Act ("ADA") (First Amended Complaint, "Complaint" ¶ 15, ECF No. 18), and in count four Plaintiff alleges that Defendants Heather Richardson and Kyle Ruffner violated his Fourth Amendment rights. (Complaint ¶ 18.) Defendants Richardson and Ruffner, who at all relevant times were employed with the MDOC, and the MDOC move for dismissal of counts three and four of the amended complaint. (Motion to Dismiss, ECF No. 20.)

Following a review of the record and after consideration of the parties' arguments, I recommend the Court deny Defendants' motion to dismiss.

## FACTUAL BACKGROUND[1]

Plaintiff was incarcerated at the Maine State Prison in Warren, Maine, from December 2015 to February 2022. (Complaint ¶ 22.) The Maine State Prison is operated by the MDOC.

Plaintiff has an extensive mental health history. (Complaint ¶ 34-37.) His diagnoses over the years include ADHD, Mood Disorder, Adjustment Disorder, PTSD, Bipolar, anxiety, and depression. (*Id.* ¶¶ 37-39.) Plaintiff alleges Defendants had access to relevant medical records and knew of Plaintiff's mental health history. (*Id.* ¶ 45.)

Plaintiff's incarceration began in late 2015 and he received his initial mental health evaluation on December 23, 2015. (*Id.* ¶¶ 64-65.) According to Plaintiff, his mental health began to decline around April 2018. (*Id.* ¶ 66.) During this "downward spiral," Plaintiff assaulted an officer and was assigned to solitary confinement as a result.[2] (*Id.*)

Plaintiff had two different periods of solitary confinement. The first period began in April 2018 and lasted sixteen months. (*Id.* ¶¶ 66, 68.) The second period started in May 2020 and lasted about twenty-one months. (*Id.* ¶ 77.) During both periods, Plaintiff engaged in self-harm activity. (*Id.* ¶¶ 76, 80.)

---

[1] The factual background is derived from Plaintiff's complaint and its attachment. For purposes of evaluating Defendants' motion to dismiss, the factual allegations are deemed true. *McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017).

[2] Plaintiff alleges "'ACU placement' is solitary confinement, amounting to prolonged isolation without the ability to have meaningful human contact." (Complaint ¶ 67.) Defendants describe the placement as "ACU" and do not comment on Plaintiff's characterization of the placement as solitary confinement. (Motion to Dismiss at 2.) Plaintiff alleges that while he was in this placement, he spent at least twenty-two hours alone in his cell. (Complaint ¶ 3.) In the assessment of Defendants' motion, I will refer to the placement as alleged by Plaintiff.

Plaintiff claims that throughout his incarceration, he received "insufficient mental treatment or none." (*Id.* ¶ 87.) During both periods of solitary confinement, Plaintiff received talk therapy weekly and peer counseling. (*Id.* ¶¶ 88, 90.) Plaintiff alleges that the peer sessions were often used as a disciplinary tool. (*Id*. ¶ 90.)

In August 2020, during the second period of solitary confinement, Plaintiff requested a transfer to the Inpatient Mental Health Unit (IMHU), but his request was denied. (*Id*. ¶ 89.) In September 2020, the medical team met to discuss Plaintiff's request for IMHU and ultimately denied the request. (*Id.* ¶ 91.)

On June 17, 2020, during the second period of solitary confinement, Plaintiff and two other inmates "attempted to peacefully protest their solitary confinement conditions" by staying out in the recreation space after their allotted time. (*Id*. ¶ 79.) During the protest, they took their shirts off to wrap them around their heads to protect from the anticipated pepper spray. (*Id*. ¶ 81.) Prison officials did not deploy pepper spray, but they used a flash bomb. (*Id*. ¶ 81.)

After the flash bomb was deployed, corrections officers required Plaintiff and two other inmates strip and "they were forced, naked and cuffed, on a humiliating march through the prison." (*Id*. ¶ 82.) Plaintiff alleges Defendants Richardson and Ruffner approved and assisted this march. (*Id*.) Plaintiff claims the march led to the cafeteria where "multiple female staff members were waiting." (*Id*. ¶ 83.) Plaintiff alleges the strip search was conducted in front of both female and male staff members; after the search was conducted, he remained naked; he did not have clothes for approximately a week. (*Id*.)

3

Plaintiff alleges he attempted to cover himself with a bedsheet when he left his cell to go to the showers or infirmary.  (*Id.* ¶ 85.)

Plaintiff alleges Defendants Richardson and Ruffner conducted and approved an unreasonable search and the MDOC failed to accommodate his disability.  (Complaint, ¶¶ 15, 18.)  Defendants maintain that Plaintiff has failed to allege sufficient facts to support the claims.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), a court "must evaluate whether the complaint adequately pleads facts that 'state a claim to relief that is plausible on its face.'"  *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In doing so, a court must "assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom," but need not "draw unreasonable inferences or credit bald assertions [or] empty conclusions."  *Id.* (alteration in original) (internal quotation marks omitted); *see Bruns v. Mayhew*, 750 F.3d 61, 71 (1st Cir. 2014) ("[A] court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)).  Federal Rule of Civil Procedure 12(b)(6) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To evaluate the sufficiency of the complaint, therefore, a court must "first, 'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements,' then 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the

pleader's favor, and see if they plausibly narrate a claim for relief.'" *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (alteration omitted) (quoting *Zenon v. Guzman*, 924 F.3d 611, 615-16 (1st Cir. 2019)).

## DISCUSSION

### A.   Count III – Americans with Disabilities Act

To prevail on his claim under Title II of the Americans with Disabilities Act, Plaintiff must establish

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Buchanan v. Maine*, 469 F.3d 158, 170-71 (1st Cir. 2006) (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)).  Disability discrimination can consist of (a) the imposition of adverse consequences on a prisoner based on the prisoner's disability, (b) a prison policy that is neutral in its terms, but impacts prisoners with a disability more significantly, or (c) the refusal by the prison administrators to grant the prisoner a reasonable accommodation so that the prisoner can have meaningful access to a prison program or service.  *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014).

Plaintiff alleges the MDOC failed to provide reasonable accommodations for his disability. (Complaint ¶¶ 15-17.)  The MDOC does not challenge Plaintiff's assertion that he is a qualified individual with a disability. Rather, the MDOC contends Plaintiff's allegations amount to a disagreement of medical treatment and a treatment dispute does not constitute an ADA claim.  The MDOC also argues that other than requesting a transfer

5

to IMHU, Plaintiff "does not allege that he requested additional accommodations." (Defendants' Reply at 3.)

The ADA covers claims "based on discriminatory medical care" but claims based on negligent medical care fall outside the scope of the ADA. *Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274 (1st Cir. 2006). Although some of Plaintiff's allegations might suggest a disagreement about the quality of care provided, Plaintiff's reasonable accommodation claim is at least in part based on the MDOC's failure to provide treatment in an appropriate environment. Plaintiff asserts that the IMHU was designed for an inmate with mental health challenges to receive treatment in a location and under conditions that would be more "humane" and more beneficial than treatment provided while the inmate was in segregation. (Complaint ¶¶ 15 - 17.) Plaintiff's claim that he was denied the opportunity to receive treatment in an environment that was more conducive to effective treatment is not a claim based on a disagreement over the nature of the treatment provided. A reasonable inference to be drawn from Plaintiff's allegations is that if the same treatment available in the IMHU were provided to him in segregation, he would not have benefited from the treatment as much as he would have in the IMHU. Plaintiff's assertion that he requested but was denied a transfer to the IMHU is sufficient to support an actionable ADA claim.[3]

---

[3] The First Circuit has also recognized that a request might not be necessary if an individual's need for an accommodation is obvious. *Kiman*, 451 F.3d at 283. Plaintiff contends that the need for an accommodation for more human interaction was obvious and thus even the initial placement in segregation constitutes a failure to accommodate his disability. Because I have concluded that Plaintiff's allegation that the MDOC denied his request for a transfer to the IMHU is sufficient to support his ADA claim, I do not address his other arguments/claims.

B.   **Count IV – Fourth Amendment**

1.   **Unlawful Search**

Plaintiff alleges the strip search to which he was subjected following the protest in the prison was unlawful.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV.[4] "Although prisoners experience a reduction in many privileges and rights, a prisoner 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objective of the corrections system.'" *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Turner v. Safley*, 482 U.S. 78, 95 (1987)). "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). A court must balance the two competing interests of "the need for the particular search against the invasion of personal rights that search entails." *Id.* at 559.

"The lawfulness of a strip search depends on whether the circumstances reasonably justify such an intrusive invasion of privacy." *U.S. v. Cofield*, 391 F.3d 334, 336 (1st Cir. 2004) (citing *Bell*, 441 U.S. at 559). "The inquiry is of a practical nature, calling for a sensible assessment of the circumstances." *U.S. v. Cofield*, 391 F.3d 334, 336 (1st Cir. 2004). Reasonable searches have "no more intrusion than necessary to accomplish the

---

[4] Plaintiff asserts a state constitutional claim alongside his Federal Constitutional Claim. "Article I, section 5 of the Maine Constitution provides protections that are coextensive with the Fourth Amendment." *Fagre v. Parks*, 985 F.3d 16, 24-25 (1st Cir. 2021) (quoting *State v. Martin*, 2015 ME 91, ¶ 17 n.2, 120 A.3d 113, 118 n.2).

proper law enforcement purpose." *Cofield*, 391 F.3d at 337. In certain circumstances, a search conducted in front of a person of the opposite sex is constitutional. *Cookish v. Powell*, 945 F.2d 441 ("inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment.").

"Courts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted." *Bell*, 441 U.S. 559. Courts also weigh whether the officers required the plaintiff to "assume humiliating poses, expose himself in an unnecessarily public place or to members of the opposite sex, remain exposed for unreasonable durations, or endure degradation or ridicule." *Cofield*, 391 F.3d at 337.

Plaintiff alleges the unlawful search began when was forced to remove his clothes and required to walk through the prison. (Complaint ¶ 82.) When he arrived at the cafeteria, Plaintiff was searched in front of multiple staff members, including female staff members "for what felt like an eternity." (*Id*. ¶ 83.) Defendants characterize the search as a "limited observation of Plaintiff by female correctional officers, during an unclothed body search, after unrest in the prison." (Defendants' Reply at 6.) Defendants maintain the search was warranted because of the emergency caused by the unrest in the prison and Plaintiff's history of "violent and anti-social behavior." (*Id*.) Plaintiff argues that the "potential emergency had passed" and there was no "penological need for the search, and thus the search was "for purposes of using nudity as a tool of humiliation." (Plaintiff's Response at 17, ECF No. 22.)

Plaintiff has alleged that a search occurred under circumstances that could be deemed to be unreasonable after considering the relevant factors identified in *Bell* (i.e., scope, manner, justification, and place). Plaintiff asserts the search took place after he was handcuffed and marched through the prison. A factfinder could reasonably conclude that any emergency at least as to Plaintiff had ended. Based on Plaintiff's allegations, a factfinder could also conclude that the search occurred in a common area of the prison, took longer than necessary, and was conducted in front multiple members of the opposite sex and other individuals who were not necessary for the search. In short, Plaintiff has alleged facts that could support a finding that the search was unreasonable under the circumstances.

### 2. Qualified Immunity

Defendants argue that the doctrine of qualified immunity bars Plaintiff from obtaining the relief he seeks.

"The qualified immunity analysis has two facets: the court must determine whether the defendant violated the plaintiff's constitutional rights and then must determine whether the allegedly abridged right was clearly established at the time of the defendant's claimed misconduct." *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) (internal quotation marks and citations omitted). On the second issue (i.e., the "clearly established" issue), to avoid the application of qualified immunity, a plaintiff must: (1) "identify either controlling authority or a consensus of cases of persuasive authority sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm," and (2) "demonstrate that an objectively reasonable official in the defendant's position would have

9

known that his conduct violated that rule of law." *Id*. (internal quotation marks and citations omitted).

Defendants contend "[t]here is no precedent that would have put [them] on notice that performing an unclothed body search of three prison residents involved in a premeditated, organized disturbance, including refusal to return inside from the recreation yard, violated clearly established law." (Defendants' Motion at 11 – 12.)

At the time of the search, a reasonable officer would have known that strip searches with "inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex" were reasonable, but that absent an emergency, something more extensive would be unreasonable. *Cookish*, 945 F.2d at 447. Strip searches that lack a legitimate purpose, or strip searches that have a legitimate purpose but that are conducted in a manner designed to humiliate, abuse, or harass prisoners, are actionable. *Florence*, 566 U.S. at 339 ; *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (applying the Eighth Amendment to claims involving allegations of harassment and humiliation).

In *Cofield*, decided in 2004, the First Circuit described circumstances that could be deemed unreasonable.  In rejecting the defendant's challenge to the district court's denial of his motion to suppress evidence derived from a strip search, the First Circuit reasoned in part:

> [T]the strip search was conducted in a professional manner with no more intrusion than necessary to accomplish the proper law enforcement purpose. The officers did not require Cofield to assume humiliating poses, expose himself in an unnecessarily public place or to members of the opposite sex, remain exposed for unreasonable durations, or endure degradation or ridicule.

391 F.3d at 337.

In this case, Plaintiff has alleged that the search occurred in a public setting in the prison, took what seemed like "an eternity," and was conducted in front of multiple members of the opposite sex. As reflected by the First Circuit's discussion in *Cofield*, which was in accord with the First Circuit's reasoning and findings in *Cookish*,[5] Defendants were on notice that a search under the circumstances alleged by Plaintiff would constitute a constitutional violation. To the extent Defendants contend that the notice question must include the fact that an emergency existed at the time due to the protest (*See* Defendants' Motion at 11 – 12), Plaintiff did not allege in the Complaint that an emergency existed at the time of the search. At most, Defendants' argument identifies a factual issue (i.e., the status of any emergency at the time the search was conducted) that cannot be resolved at this stage of the proceedings.[6] While it is important to "resolv[e] immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), where "factual issues cloud the inquiry, cloaking defendants with immunity at an early stage of litigation is inappropriate." *Vinagro v. Reitsma*, 260 F. Supp. 2d 425, 430 (D.R.I. May 6, 2003) (citing *Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir. 2002)).[7] At this

---

[5] In *Cookish*, the First Circuit wrote:

> [W]e, therefore, summarize the state of the relevant law in October 1987 to have been that (1) inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment and (2) if the observation was other than inadvertent, occasional, casual, and/or restricted, such observation would (in all likelihood) violate the Fourth Amendment, e*xcept* in an emergency.

945 F.2d at 448 (emphasis in original).

[6] In his response to the motion to dismiss, Plaintiff maintains that any "potential emergency" had resolved by the time of the search. (Plaintiff's Response at 17.)

[7] In *Cookish*, the First Circuit, noting that the duration of an emergency "is not always (and perhaps not often), it would seem, marked with bright lines of demarcation," concluded the trial court erred when, citing

stage of the proceedings, Defendants are not entitled to a dismissal based on qualified immunity.

## CONCLUSION

Based on the foregoing analysis, I recommend that the Court deny Defendants' motion to dismiss.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 31st day of July, 2023.

---

a factual issue as to whether an emergency in a prison had ended at the time of the search that was challenged, the court denied summary judgment on qualified immunity grounds. 945 F.2d at 448. The First Circuit and the trial court had the benefit of a summary judgment record from which to discern whether the search occurred within the "continuum of time at which a prison official could not reasonably believe that his [or her] conduct was occurring during the course of an emergency." 945 F.2d at 449. A more developed record is required here to assess the status of any emergency at the time of the search and how that status informs the qualified immunity analysis.